IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 16 CR 80 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| VANDETTA REDWOOD | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Vandetta Redwood ("Defendant") moves the Court to suppress identification evidence and testimony as fruit of an unlawful arrest in violation of her Fourth Amendment rights and unnecessarily suggestive law enforcement identification procedures. The Court denies Defendant's motion for the reasons set forth below.

**BACKGROUND**

**I.    The CPD Investigation and Defendant's Arrest**

The charges against Defendant are premised on events that took place on April 28, 2014, during a fight among high school students. Defendant is charged with giving D.P., her then 14-year old cousin, a loaded firearm and telling her to shoot another 14-year old girl. D.P. then used the firearm to shoot two teenage girls, killing one of them.

Various eyewitnesses identified D.P. as the shooter. Shortly after the shooting, a police officer stopped D.P. a few blocks away from the scene because she matched the description of the shooter. Eyewitnesses identified D.P. as the shooter, and CPD officers took her into custody. At the police station, D.P. waived her *Miranda* rights. Officers then interviewed her with her mother present and videotaped the interview. During the interview, D.P. admitted to shooting the two girls. D.P. admitted that Donnell Flora (her uncle), Defendant Redwood, whom she referred to as her "auntie," her cousin and her friends went to the scene of the shooting with her.

She said that Donnell Flora initially gave her the gun, and then Redwood took the gun from her. D.P.'s mother then interjected and said "and Vendetta [Redwood] passed it back to you." Although D.P.'s mother did not witness this event because she was not present at the scene of the shooting, she told the officers that D.P.'s friends and family members who were present at the scene had told her what had happened.

After the interview, the officers and D.P.'s mother left the police station. A large group of D.P.'s friends and family had gathered outside the station, including Defendant Redwood. D.P.'s mother then identified Defendant Redwood, and the police arrested her. The police also arrested D.P.'s uncle, Donnell Flora.

The police then took Defendant Redwood's arrest photo and led her to an interview room where they read her her *Miranda* rights. Defendant waived her rights and spoke to the officers. During the questioning, she denied that she was at the scene of the shooting. Defendant said "I came down there later on that day after it [the shooting] happen."

Soon after the shooting, the police also received a cell phone video of the incident that a witness filmed. (GX4.) The police and the government showed a number of witnesses both an unaltered version of the video and a slowed version, one-fourth the speed of the unaltered. The Court has observed both videos numerous times.

## II. Defendant's Federal Charges

The federal government began investigating Defendant in approximately December 2014. On February 10, 2016, a federal grand jury returned a two-count indictment (the "Indictment") against Defendant. (R. 1.) Count One charges Defendant with transferring a handgun and ammunition, namely, a loaded Smith & Wesson, Model 642 Airweight, .38 special caliber revolver, bearing serial number CRZ6547, to Minor A, knowing and having reasonable cause to

believe that Minor A was a juvenile, in that she had not attained eighteen years of age, and knowing and having reasonable cause to believe that Minor A intended to carry and otherwise possess and discharge and otherwise use the handgun and ammunition in the commission of a crime of violence, namely first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm, in violation of 18 U.S.C. §§ 922(x)(1)(A), (B) and 924(a)(6)(B)(ii). (*Id.*) Count Two charges Defendant with knowingly possessing in and affecting interstate commerce a firearm, namely, the same handgun identified above in Count One, which firearm had traveled in interstate commerce prior to Defendant's possession of the firearm, within a distance of 1,000 feet of the grounds of Oliver Wendell Holmes Elementary School and Visitation Catholic School, a place that Defendant knew and had reasonable cause to believe was a school zone, in violation of 18 U.S.C. §§ 924(q)(2)(A) and 924(a)(4). (*Id.*)

## ANALYSIS

Defendant moves the Court to suppress "trial testimony about out-of-court and in-court identifications, [1)] on the ground that identification evidence as [sic] the fruit of an unlawful arrest in violation of the Fourth Amendment and [2)] on the grounds that law enforcement officers used identification procedures that were unnecessarily suggestive." (R. 45 at 1.) The Court addresses each argument in turn.

### I. Defendant's Arrest was Supported by Probable Cause

Defendant reasserts her arguments from her motion to suppress various statements that Defendant's arrest was not based on probable cause. (R. 44.) Here, she alleges that "[t]he police in this case exploited the illegal arrest of Defendant by taking her photograph for the purpose of investigating her whereabouts and/or actions on the date of the alleged offense." (R. 45 at 5.) Accordingly, she argues, any identifications "are and will be based on an out-of-court

3

identification of photographs obtained as a result of the Defendant's unlawful arrest[.]" (*Id*. at 3.) Indeed, Defendant asserts that "[a]ny in-court identifications by the witnesses will, therefore, be tainted by the unlawful arrest[.]" (*Id*.) As such, Defendant "seeks to suppress the identification evidence, and corresponding testimony or in-court identifications, stemming from the photo arrays displayed to witnesses by the Chicago Police Department ("CPD") based on a causal link to the illegal arrest." (*Id*. at 5.)

On June 16, 2016, however, the Court ruled that Defendant's arrest was based on probable cause and constitutional. (R. 104 at 6–10.) The Court herein incorporates that ruling and analysis. The resulting arrest photo, therefore, was not "tainted" or unduly suggestive. The officers received a report of the shooting, found one minor injured and another dead, interviewed at least two eyewitnesses identifying the shooter, and interviewed the shooter who confessed and implicated Defendant, her own cousin, in the crime. Considering the totality of the circumstances, the CPD officers had probable cause to arrest Defendant. *See United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016). Thus, the arrest photo was not a result of an unconstitutional arrest and was not unduly suggestive. As a result, the Court denies this aspect of Defendant's motion.

## II. Defendant Has Not Demonstrated that Law Enforcement's Identification Techniques were Unnecessarily Suggestive

In addition, Defendant argues that "any in-court identifications will be the unreliable product of an unnecessarily suggestive identification procedure and should be excluded under the Due Process Clause of the Fourteenth Amendment." (R. 45 at 6.) Defendant maintains that "police used unnecessarily suggestive identification procedures giving rise to a 'substantial likelihood of irreparable misidentification.'" (*Id*. (citing *Manson v. Braithwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).) Specifically, Defendant asserts the following:

4

> There is no evidence that the Government's proposed witnesses actually viewed the alleged transfer despite being present at the crime scene and depicted in the melee. Instead, their identifications and incriminating statements are based on his [sic] review of the video afterwards. . . . Here, the video and particularly the slow version of the video, is so suggestive that the witnesses are merely saying what they saw, or think they saw, on the video not what they actually observed on the date in question as the video establishes most if not all the Government witnesses could not have observed same, even if it occurred, not based on the vantage point of the witnesses and/or the location of D.P. and Ms. Redwood. None of the witnesses made such an assertion independent of the video. Accordingly, any witness who only implicated Ms. Redwood, in handling the firearm, after they observed the video, is so unreliable that admission of such in-court identification, or any testimony about observing the Defendant with the firearm, will result in an unfair trial.

(*Id*. at 1–3.) Defendant also filed a supplement, including in part, a number of witness interview excerpts, which the Court has reviewed.

Defendant has not met her burden to show that law enforcement's out-of-court identification procedures were unnecessarily suggestive. Defendants have a due process right not to be subject to unreasonably suggestive identification procedures that create a "substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (citation and internal quotation marks omitted). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire,* 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012) (citations omitted). "Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." *Id.* Courts should suppress the identification only when there is "a very substantial likelihood of *irreparable* misidentification." *Id.* (citations and quotations omitted). An irreparable misidentification exists when "the procedures of trial would not suffice to allow jurors to separate reliable from mistaken identifications." *United States v. Johnson*, 745 F.3d 227, 229 (7th Cir. 2014).

5

The Seventh Circuit has adopted a two-prong approach to determine whether identification procedures have risen to a constitutional violation. First, courts consider whether the identification procedure that law enforcement used was "both suggestive and unnecessary." *United States v. Sanders*, 708 F.3d 976, 983-84 (7th Cir.) *cert. denied*, 134 S. Ct. 803, 187 L. Ed. 2d 608 (2013) (citing *Perry*, 132 S. Ct. at 724). Second, courts look to the "totality of the circumstances" to determine whether other indicia of reliability "outweigh[ ] . . . the corrupting effect of law enforcement suggestion." *Id.* (citing *Perry,* 132 S. Ct. at 725). Courts only look to the second prong if the defendant establishes the first prong. *See Perry*, 132 S. Ct. at 730.

In order to establish that the identification procedure was both suggestive and unnecessary under the first prong, "the situation must have involved 'improper state conduct'— one in which the circumstances did not justify law enforcement's suggestive behavior." *Sanders*, 708 F.3d at 984. This prong "focuses on police conduct—its suggestiveness and necessity in the specific situation at hand." *Id.*

Defendant fails to meet her burden under the first prong. Specifically, Defendant does not demonstrate "improper state conduct" and, as a result, fails to show that the government's out-of-court identification procedures were suggestive and unnecessary. *Sanders*, 708 F.3d at 984. Defendant does not dispute the authenticity of the video illustrating the events surrounding the shooting. Instead, Defendant contends that it was improper for law enforcement to show the witnesses the video and to use a slowed-down version of the video. Both actions were proper. Within days after the shooting, the CPD officers received a video of the incident that a witness filmed. (GX4.) Law enforcement subsequently preserved an unaltered version of the video and created a slowed-down version, one-fourth the speed of the unaltered version. They then showed both videos to various witnesses they interviewed who were present on the day of the incident

6

and were depicted in the video. "The ability of a person—whether a police officer defending a confession as voluntary or a citizen alleging arrest by unreasonable force—to demonstrate the event via video can significantly augment a case." Dustin F. Robinson, *Bad Footage: Surveillance Laws, Police Misconduct, and the Internet*, 100 Geo. L.J. 1399, 1415 (2012). Indeed, the Supreme Court has even found video evidence to be dispositive. *See Scott v. Harris*, 550 U.S. 372, 378–81, 384, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ("There is, however, an added wrinkle in this case: existence in the record of a videotape of capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. . . . The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape. . . . [I]t is clear from the videotape that respondent posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase.") It was entirely proper for law enforcement officers to use the witness-made video, depicting the witness-interviewees at the event in question, during the investigation. Similarly, it was proper for the officers to use a slow motion version of the video. *See United States v. Plato*, 629 F.3d 646, 652 (7th Cir. 2010) ("[Defendant] argues that allowing the jurors to watch the surveillance video in slow motion in open court during jury deliberations amount to a violation . . . We cannot see how; the surveillance video—the authenticity of which was unquestioned—had already been admitted into evidence and played for the jury in its entirety.") Again, Defendant does not contest the authenticity of the video and fails to explain how showing witnesses the slow-motion version prejudiced her in any way. Thus, she has not met her burden to show that law enforcement's

7

identification techniques were improper or that they presented "a very substantial likelihood of *irreparable* misidentification." *Perry*, 132 S. Ct. at 724

Further, Defendant asserts that the officers' use of the video during witness interviews was unduly suggestive, as "most witness statements indicate that they had never before met the Defendant nor observed the Defendant." (R. 45 at 7.) Defendant claims that "the evidence does not establish that the witnesses actually observed the alleged events when they occurred but instead indicated same only after watching the slow version of the video[.]" (R. 95 at 2.) Consequently, Defendant moves to suppress identification evidence, as the government has not "demonstrate[d] that any in-court identification by the witness [will] rest on a source independent of the tainted pretrial identification." (*Id*. at 7 (citing *United States v. Wade*, 388 U.S. 218, 241 (1967)).) Both the facts and the law dictate otherwise.

First, the evidence directly contradicts Defendant's argument that each witness relied exclusively on the video. In an October 2015 grand jury proceeding, for example, I.H. and the government had the following exchange:

> Q. You said that after [Redwood] took the shiny object from D.P., then *you saw with your own two eyes* this woman take the gun and kind of put it in her jacket?
>
> A. Like her sleeve. *** I couldn't see a shiny object up her sleeve, but I knew it were there. I pretty much put two and two together and figure it our—and I could tell what it was.
>
> Q. Okay. So you saw [Redwood] take the shiny object, and then you saw her make a motion which you—putting her hand up her sleeve, which you believe she was putting the firearm up her sleeve?
>
> A. Yes.
>
> Q. Then she went off to the side of the house?
>
> A. She went to the side of the house to get off camera.

8

| | | |
|---|---|---|
| Q. | | Okay. And when you say "off camera," that's because you seen [sic] a video of this, right? |
| A. | | Yes. |
| Q. | | *But you saw with your own two eyes* that she put that in her sleeve and walked kind of to the side, right? |
| A. | | *Yes*. |
| Q. | | And then after she put that what you believe was the firearm in her sleeve, you saw that woman go back over to D.P.? |
| A. | | Yes. |
| Q. | | And where were you when you saw [Redwood] go back over to D.P.? |
| A. | | I was kind of like behind the camera watching. |
| Q. | | Okay. Back behind— |
| A. | | The cameraman playing the video, and I'm just watching at that point. |

(R. 95-1 at 18–19 (emphasis added).) I.H. explicitly testifies that he or she not only observed the video during a government interview, but also personally witnessed the events in question. Moreover, I.H.'s testimony that he was standing right where the cameraman was located and "watching" contradicts Defendant's argument that I.H.'s testimony that he observed the events with his own two eyes is "inconsistent with the witness' [sic] vantage point and the focus of his attention." (R. 95 at 5.) Further, as the government notes, TeTw, another minor witness, told police in an interview on May 22, 2014, less than a month after the shooting, that she had seen Defendant Redwood both on the bus shortly before the shooting and at the scene. Notably, TeTw described Defendant Redwood's clothing—a black jacket, black bonnet, and black jeans—before law enforcement even showed her the video. The video corroborated TeTw's description. Thus, Defendant's claim that the government's out-of-court identification evidence,

9

and as a result any subsequent in-court identifications, is based on the video alone is incorrect. As a result, Defendant fails to illustrate "improper state conduct." *Sanders*, 708 F.3d at 984.

Second, Defendant's reliance on *Wade* is incomplete. "*Wade*'s holding . . . must be understood in light of the Supreme Court's later decision in *United States v. Ash*, 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973)." *United States v. Gallo-Moreno*, 584 F.3d 751, 754 (7th Cir. 2009). Specifically, courts must not only assess the alleged unlawful post-indictment identification procedure, but also inquire "whether any errors or overreaching that may have infected the identification can be 'cured' through the presence of counsel at trial." *Id.* (citing *Ash*, 413 U.S. at 300). "The traditional counterbalance in the American adversary system for [witness] interviews arises from the equal ability of defense counsel to seek and interview witnesses [her]self. That adversary mechanism remains as effective for a photographic display as for other parts of pretrial interviews. . . . No greater limitations are placed on defense counsel in constructing displays, seeking witnesses, and conducting photographic identifications than those applicable to the prosecution." *Ash*, 413 U.S. at 318–19; *see also id.*, 413 U.S. at 325 (Stewart, J., concurring) ("Preparing witnesses for trial by checking their identification testimony against a photographic display is little different, in my view, from the prosecutor's other interviews with the victim or other witnesses before trial. While these procedures can be improperly conducted, the possibility of irretrievable prejudice is remote, since any unfairness that does occur can usually by flushed out at trial through cross-examination of the prosecution witnesses.") Relatedly, "[i]t is the 'reliability of identification evidence that primarily determines its admissibility.'" *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1049 (7th Cir. 2003) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)); *see also United States v. Johnson*, 859 F.2d 1289, 1296 (7th Cir. 1988) (quoting *Watkins v.*

*Sowders*, 449 U.S. 341, 347, 101 S. Ct. 654, 658, 66 L. Ed. 2d 549 (1981)). "It is the jury, in turn, that determines reliability." *Johnson*, 859 F.2d at 1296. Indeed, "the only duty of a jury in cases in which identification evidence has been admitted will often be to assess the reliability of that evidence." *Id*. (citing *Watkins*, 449 U.S. at 347); *see also Harden v. Kingston*, 166 Fed. App'x 243, 246 (7th Cir. 2006) ("[Defendant's] counsel highlighted the shortcomings of [the witness's] identification, and the court instructed the jury on 'the proper evaluation of evidence.' The jury ultimately considered the reliability of [the witness's] testimony. Under the circumstances presented here, due process was not offended by permitting the jury to perform that function.") (quoting *Watkins*, 449 U.S. at 347–48). "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Gregory-Bey*, 332 F.3d at 1049 (quoting *Abrams v. Barnett*, 121 F.23d 1036, 1042 (7th Cir. 1997)). In short, Defendant will have the opportunity to cross-examine witnesses before the jury regarding the out-of-court identification evidence and the government's use of the videos during witness interviews. As a result, Defendant has failed to show that "the procedures of trial would not suffice to allow jurors to separate reliable from mistaken identifications." *Johnson*, 745 F.3d at 229. Thus, Defendant has not met her burden to show that law enforcement's identification techniques presented "a very substantial likelihood of *irreparable* misidentification." *Perry*, 132 S. Ct. at 724.

      Accordingly, Defendant has failed to meet her burden under the first prong to demonstrate that law enforcement's out-of-court identification techniques were unduly suggestive. The Court, therefore, denies Defendant's motion to suppress.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion to suppress identification evidence and testimony.

**DATED: August 11, 2016**  **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge